**FILED**
**JANUARY 22, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**08 C 501**

**JUDGE DARRAH**
**MAGISTRATE JUDGE DENLOW**

**J. N.**

# EXHIBIT A

RETAIL MEMBER AGREEMENT WITH TRUSERV CORPORATION
A COOPERATIVE OF INDEPENDENT RETAILERS

THIS AGREEMENT between    Livermore Andersen Hardware, Inc.
d/b/a   Schultz True Value

☒ True Value        ☐ Home & Garden Showplace        ☐ Induserve        ☐ Non-Branded
☐ Grand Rental                           ☐ Party Central                 ☐ Taylor Rental

of                    7020 West Higgins Ave.  Chicago, IL  60656
                              (Full Address)

the retail member hereinafter referred to as the "Member," and TRUSERV CORPORATION, a Delaware Corporation, hereinafter referred to as the "Company."

The Company is an organization operated on a cooperative basis by and for independent retailers who operate hardware stores, home or garden centers, rental stores or similar operations.

**MEMBER AND COMPANY AGREE AS FOLLOWS:**

1.     This agreement is subject to and incorporates herein the Company's By-Laws, Subscription to Shares agreement, and the Members' Policies and Procedures Manuals ("Manuals") all of which may be amended from time to time (hereinafter collectively referred to as "Agreement").

2.     The Company shall sell merchandise of the type typically sold in retail hardware stores, home and garden centers, rented at full service rental centers, or sold to commercial/industrial customers, provide for shipment or delivery of such merchandise to the Member's address indicated on this Agreement, permit use of the service mark associated with the program checked above ("Designated Mark") and other permitted Company owned servicemarks, trademarks, collective membership marks, tradenames or brandnames ("Marks") under the conditions of this Agreement and offer services to the Member as Company may decide to offer from time to time.

3.     The Company shall invoice Member at the Company's then current prices for the merchandise and services involved, and apply all payments by Member toward final settlement of the Member's financial obligations to the Company. The excess, if any, of the payments made, less any additional expenses due to non-conformance with established payment policies or prescribed procedures, shall be paid or credited to the Member.

4.     The Company shall pay to the Member a Patronage Dividend on the basis of the volume of and margins applicable to merchandise and services purchased by the Member from the Company during each such year that Patronage Dividends are available. The availability of Patronage Dividends shall be determined as of the end of each fiscal year of the Company and shall be payable out of the excess, if any, of gross margins from business done with or for Members, after deducting therefrom the following:

   (a) Expenses directly or indirectly related to such business;

   (b) Such reasonable charges and reserves for necessary corporate purposes as may from time to time be determined by the Company for depreciation and obsolescence, state and federal taxes, bad debts, casualty losses, insurance and other corporate and operating charges and expenses, all established and computed in accordance with generally accepted accounting principles; and

   (c) Such reasonable charges and reserves for working capital necessary for the operation of the Company and for deficits arising from such operation, including deficits from business other than business done with or for Members.

MA-TS 4-10-04

(d) In any fiscal year, to the extent a loss exists after deducting such expenses, charges and reserves, the Company will determine on a reasonable basis a plan to allocate the loss to Members.

The Company shall reasonably allocate and pay any Patronage Dividend within a time reasonably determined by the Company following the end of each fiscal year, but in no event later than the fifteenth day of the ninth month after the close of each such fiscal year, in accordance with its By-Laws, policies and procedures as they may be amended or changed from time to time.

5.  The Company shall hold Markets and other meetings from time to time for the purpose of keeping Members better informed on trends in the industry, presenting merchandise or services available and enabling Members to exchange ideas with fellow Members.

6.  Upon execution of this Agreement, the Member shall purchase sixty (60) qualifying shares of the Company's Class A Common Stock at a purchase price of $100 per share for each store owned by Member, to a maximum of three hundred (300) shares for five (5) or more stores, as defined in the Subscription to Shares agreement.

7.  The Member shall establish, operate and maintain a retail hardware store, and/or home or garden center ("Retail Store") retailing merchandise and services to consumers if the Designated Mark is True Value or Home & Garden Showplace, or a full service rental store ("Rental Center") renting appropriate merchandise if the Designated Mark is Taylor Rental, Grand Rental or Party Central, or sell commercial/industrial merchandise if the Designated Mark is Induserve ("MRO location") and sell or rent merchandise carrying any of the Company's Marks only at the authorized retail location indicated on this Agreement.

8.  The Company has not granted any protected or exclusive territorial or geographical rights to Member and the Company may, at its sole discretion, accept any other Member at any location without limitation.

9.  The Member shall utilize the Company as its primary supplier for the types of merchandise offered by the Company under each Agreement for which a Member signs.

10. The Member shall buy from the Company in accordance with the Company procedures and practices set forth in the Manuals, which include entering warehouse orders and claims using electronic order entry equipment functionally compatible with the Company's equipment, and entering all other orders using electronic equipment whenever possible.

11. The Member shall notify the Company, in writing, immediately upon any change in business name, form, ownership or control.

12. The Member shall pay in full on the date due all invoices on accounts receivable statements and any other financial obligations to the Company or its subsidiaries, and pay a one and one-half percent (1-1/2%) per month service charge, but not to exceed the maximum amount permitted by law, on past due balance of accounts. Upon termination of this Agreement, all invoices on accounts receivable statements and any other financial obligations to the Company or its subsidiaries, including future dated invoices, from the Member to the Company and its subsidiaries shall become immediately due and payable in full.

13. All information and material furnished to the Member, including without limitation, bulletins, price lists, illustrated catalogs, merchandising and pricing options, computer software, electronic data and the Manuals are confidential property of the Company, developed and promoted for the benefit of Members, and the Member agrees not to divulge or display any of the information contained in this material to anyone who is not a Member, or not affiliated with the Company without obtaining the prior written approval of the Company, and not to use such information in a way which is detrimental to the Company or its Members. The Member shall use such information and material only in connection with the Member's purchases from the Company and for the purpose of promoting the Member's business with the Member's customers. The Member acknowledges and confirms that any dissemination or other disclosure of such information and material for any other purpose, or to anyone not affiliated

with the Company, shall cause immediate and irreparable harm to fellow Members and the Company. All such information and material shall be immediately returned to the Company upon termination of this Agreement.

14.  Member shall provide all financial statements, guarantees, security agreements and any other supporting materials or documents as may from time to time be requested by Company in relation to this Agreement.

15.  Member represents that it has reviewed the By-Laws and prospectus of the Company, the receipt of which is hereby acknowledged, the By-Laws providing that Membership in the Company constitutes consent to take written notices of allocation into account at their stated dollar amount as provided in section 1385(a) of the IRC, unless such written notices clearly indicate on their face that they are nonqualified, in the taxable year in which received. By entering into this Agreement Member agrees and consents to be bound by Article IX, section 2(b) of the By-Laws. Such "membership consent" (within the meaning of section 1388(c)(2)(B) of the IRC) may be revoked by Member only by terminating its Membership in the Company in the manner provided in this Agreement.

16.  Member acknowledges that the Company, with the approval of the Board of Directors, has the authority to set the composition of the Patronage Dividend each year, provided that at least twenty percent (20%) of each Member's share is paid in cash or qualified check in accordance with section 1385 of the IRC.

17.  Member acknowledges that any cash payments, dividends, note maturities, interest or other payments may be applied to outstanding past due debt with Company at the Company's option and sole discretion.

18.  Member acknowledges that the Member may receive different services, charges or freight rates based on the amount of merchandise purchased by Member.

19.  Member's right to use any Designated Mark or other Mark shall be subject to the right and necessity of the Company to control the use of its Designated Mark and other Marks and to maintain the reputation for quality products and services and goodwill associated with such Marks. The Member's right to the display and use of the Designated Mark or any other Marks are permitted only on the following conditions:

(a) The Designated Mark and any other Marks permitted by the Company, are the only Company owned trademarks or servicemarks which Member is entitled to use, and the Company may, at its sole discretion, choose to sell merchandise carrying any of the Company's Marks only to Members who are permitted to use a particular Designated Mark;

(b) The Designated Mark or any other Marks cannot be used with the trademark or servicemark of any hardware store, home or garden center, building center, rental center or merchandising organization other than the Company's, and may only be used at the retail location indicated on this Agreement so long as the retail location continues to be an active retail location and as determined to be appropriate by the Board of Directors;

(c) The Member's store and premises will be maintained in a clean and orderly condition;

(d) If a Retail Store, the Member will offer sufficient breadth and depth of merchandise in the core retail departments to serve the needs of retail consumers. For a hardware store, these departments include: Builders Hardware and Supplies, Cleaning Supplies, Electrical Supplies, Lawn and Garden, Paint and related Sundries, Plumbing, Tools and Home Decor; if a Rental Center, the Member will offer sufficient breadth and depth of rental merchandise to serve the needs of rental consumers; and if a MRO location, the Member will offer sufficient breadth and depth of merchandise sufficient to serve the needs of commercial/industrial consumers.

(e) If a Retail Store or an MRO location, the Member will maintain a retail inventory of representative quantities of the Company's merchandise as offered, advertised and promoted by the Company;

(f) The Member's business operations will be conducted in such a fashion as to enhance the reputation of fellow Members and the Company; and

(g) That Member shall not be entitled to use the Designated Mark or any other Marks as part of its corporate or partnership name, with the exception of any Member who was a Member and used it as such prior to January, 1997.

(h) That Member shall secure and maintain in force all required licenses, permits, and certificates relating to the conduct of its business pursuant to this Agreement. That Member shall comply with all applicable laws, ordinances and regulations.

(i) In order to preserve the goodwill in the Designated Mark or Marks, that Member shall in all dealings with its customers, suppliers, Company, and public officials adhere to high standards of honesty, integrity, fair dealing and ethical conduct and Member agrees to refrain from any activity which may be injurious to Company and the goodwill associated with the Designated Mark or Marks.

20. During the term of this Agreement, Member shall not obtain any proprietary rights in the Designated Mark or any other Marks by use thereof. Member expressly acknowledges and agrees that the license granted under this Agreement to use the Designated Mark or any other Mark is non-exclusive and non-transferable, and that the Company has and retains the right to grant other licenses without any limitations as to territory, product, terms or otherwise. Within thirty days of termination of this Agreement, Member shall cease the use of all Marks, including the Designated Mark, and remove, at Member's expense, all store identification signs and decals which contain any Designated Mark or other Marks and Member shall cease any display or advertising, directly or indirectly, as a store using the Designated Mark or other Marks, including but not limited to, display in internet web sites and telephone directories. Member shall further delete the Designated Mark and any other Marks from its business name including, if applicable, Member's corporate name. Member shall transfer to the Company, at Member's expense, any internet domain names which contain the Designated Mark or any other Marks. Member agrees to confirm in writing thirty days after termination of this Agreement that Member has ceased using the Designated Mark and any other Marks.

21. If Member fails to comply with Section 20 within the time stated, Member authorizes and fully empowers the Company, or its agent, at Member's expense, to enter upon its store property and buildings, and remove all exterior and interior signs, decals and other identification items specified in that paragraph, to withhold any monies due Member until the terms of this paragraph are complied with and Member shall pay to the Company not as a penalty but as a hold-over royalty, the sum of $500 per day for each day beyond the thirty days that the Member fails to comply with that Paragraph. Company may, at its option, pursue any and all remedies available to Company for breach of this provision, including equitable or injunctive relief as well as collect the holdover royalty payment and any other damages. Member agrees to release, waive and forever discharge Company from any and all claims, demands, losses and liabilities, of any nature whatsoever, related to Company's exercise of its rights under that Section.

22. Company has not represented to Member that a "minimum", "guaranteed", or "certain" income can be expected or realized. Success depends, in part, on Member devoting dedicated personal efforts to the business and exercising good business judgment in dealings with customers, suppliers, and employees. Member also acknowledges that neither Company nor any of its employees or agents has represented that Member can expect to attain any specific sales, profits, or earnings. If Company has provided estimates to Member, such estimates are for informational purposes only and do not represent any guarantee of performance by Company to Member. COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES EITHER EXPRESS OR IMPLIED REGARDING THE PERFORMANCE OF MEMBER'S BUSINESS.

23. Subject to Section 9, Member, as an independent retailer, is free to decide how to operate its business, determine what merchandise it will stock, sell or rent and how its store shall be identified utilizing the Designated Mark and additional words or phrases that identify the specific location indicated on this Agreement.

24. Member and Company understand and agree that this Agreement does not create a fiduciary relationship between Member and Company, and that Member and Company are and will be independent contractors, and that nothing in this Agreement is intended to make either Member or Company a general or special agent, joint venturer, partner, or employee of the other for any purpose. Member agrees to identify itself conspicuously in all dealings

with customers, suppliers, public officials, store personnel, and others as the independent owner of Member's store and to place notices of independent ownership on forms, business cards, stationery, advertising and other materials.

25. Member and Company may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other. Company will not be obligated for any damages to any person or property directly or indirectly arising out of Member's store's operation or the business conducted by Member under this Agreement.

26. The amount of any distributions with respect to Member's patronage made in written notices of allocation (as defined in section 1388 of the IRC) and which are received by Member from the Company, will be taken into account by Member at their stated dollar amounts in the manner provided in section 1385(a) of the IRC in the taxable year in which such written notices of allocation are received by Member; provided, however, that this Agreement shall not extend to written notices of allocation received by Member as part of a Patronage Dividend which clearly indicate on their face that they are nonqualified. The Member understands and agrees that the Promissory Notes and the shares of Class B Common Stock distributed by the Company in payment, or part payment, of the Patronage Dividends are "written notices of allocation" within the meaning of the statute and must be taken into account by Member. The stated dollar amount of the Promissory Notes is the principal amount thereof and the stated dollar amount of the shares of Class B Common Stock is the par value thereof. The first sentence of this paragraph is intended to constitute "consent in writing" within the meaning of section 1388(c)(2)(A) of the IRC and may be revoked as provided in section 1388(c)(3)(B) of the IRC, provided, however, that, so long as Member remains a member of the Company, revocation by Member of its "consent in writing" shall not revoke Member's "membership consent."

27. The Promissory Notes and Class A and Class B Common Stock need not be physically distributed to the Member but may be held in safekeeping for the Member (either in separate securities or as part of a bulk security) and that notices of the Member's allocation of Promissory Notes and Class B Common Stock to be deposited in safekeeping are "written notices of allocation" and shall be taken into account as provided for in this Agreement.

28. This Agreement is not assignable or transferable by the Member without the written consent of the Company, but Company shall have the right to assign this Agreement. Change in control or management of a corporate, partnership or limited liability company Member must be approved in writing by the Company.

29. This Agreement shall continue in force from year to year unless it is terminated as follows:

(a) The Company shall have the right to immediately terminate this Agreement by written notice to the Member, (i) in the event and at the time or after the Member becomes insolvent, commits any act of bankruptcy, files a voluntary petition in bankruptcy, is adjudicated a bankrupt; (ii) if Member breaches any term, condition or obligation under this Agreement or any other agreement with the Company or one of its subsidiaries, which breach is not cured within thirty (30) days (ten (10) days in case of nonpayment of accounts receivable statements or any other financial obligations to the Company), or within the applicable cure period in an agreement with the Company after the Member's receipt of written notice of such breach from the Company; or (iii) if Member fails to obtain written consent by the Company to a change in control or management of a corporation, partnership or limited liability company Member.

(b) This Agreement may be terminated unilaterally by the Member upon sixty (60) days written notice mailed to the Chief Executive Officer or Treasurer of the Company at the Company's principal office.

(c) This Agreement may be terminated unilaterally by the Company upon sixty (60) days written notice mailed to the Member at the address shown on the books of the Corporation; provided, however, that such termination by the Company shall occur after the affirmative vote of two-thirds or more of the directors then in office that such termination is in the best interests of the Company as determined in the sole discretion of the Board of Directors.

30. This Agreement shall be automatically modified upon notice from the Company to the Member of any relevant change in the Certificate of Incorporation and/or By-Laws of the Company, or by resolution of the Board of Directors.

31.     This Agreement, and any other agreement which Member signs with the Company, is the entire and complete Agreement between the Member and the Company and there are no prior agreements, representations, promises, or commitments, oral or written, which are not specifically contained in this Agreement or any other agreement which Member signs with the Company. The current form of the Company Member Agreement shall govern all past and present relations, actions or claims arising between the Company and the Member.

32.     Should any provision of this Agreement be declared invalid under or in conflict with any existing or future law or regulation such provision shall be modified to conform with that law and such modification shall not affect any other provision of this Agreement which shall continue in full force and effect.

33.     The failure on the part of the Company at any time or times to enforce its rights under this Agreement, its Certificate of Incorporation, its By-Laws, its Manuals, any Company policies or procedures, or any written agreements with Member shall not constitute or be held to be a waiver of any succeeding breach thereof.

34.     The Company, but not the Member, shall have a lien on and a right, but not an obligation, of setoff against any Company issued stock or notes, dividends, interest payments or other funds held by or issued to Member, including those issued as Patronage Dividends, and against any cash portion of such Patronage Dividend which is in excess of twenty percent (20%) of the overall Patronage Dividend payable in any year for such indebtedness of the Member to the Company or its subsidiaries as may, for whatever cause, exist, including without limitation borrowings, accounts payable, and the Member's share of Company losses, as reasonably determined by the Company. Upon termination, Company shall have no obligation to redeem Member's investment unless and until all amounts due and owing the Company on accounts receivable statements, ancillary agreements with the Company or any other financial obligations to the Company or its subsidiaries are paid in full. In the event that the Company initiates proceedings to recover amounts due it by Member or for any breach of this Agreement or to seek equitable or injunctive relief against the Member, the Company shall be entitled to the recovery of all associated costs, interest and reasonable attorney's fees. This Agreement shall be enforced against either Member or Company, only in the state or federal courts located in Cook County or any Illinois county contiguous to Cook County, Illinois or in the county in which the Company's headquarters are then located, and only be interpreted in accordance with the substantive laws of Illinois without giving effect to its conflict of laws principles.

35.     This Agreement may not be modified except as set forth herein or by a writing referencing this Agreement and signed by the Company.

MA-TS 4-10-04

Prospective Member's signature on this Agreement constitutes an offer only and this Agreement shall have no force or effect until duly accepted and signed by the Company at its principal office and National Headquarters.

WITNESS the Member's hand and seal this ___7th___ day of ___December___, 2004

_____Livermore Andersen Hardware, Inc._____
Member Entity

d/b/a  Schultz True Value

check:  ☐ sole proprietor   ☐ partnership   ☒ corporation   ☐ limited liability company

Retail Location Address  7020 West Higgins Ave.

City ___Chicago___  State ___IL___  Zip 60656

By: _Livermore_ (signature)

Title: __SECRETARY__

WITNESS __Hugh Reitman__

Address __106 MAINSAIL DR.__

City __GRAYSLAKE__  State __IL__  Zip __60030__

ACCEPTED this __11th__ day of __February__, 20 __05__, at Chicago, Illinois,

By TRUSERV CORPORATION, by its duly authorized agent.

_(signature)_   Barbara L. Wagner
               Vice President
                                          Title

7

MA-TS 4-10-04

# EXHIBIT B

## RETAIL MEMBER AGREEMENT WITH TRUSERV CORPORATION
## AN INDEPENDENT RETAILER COOPERATIVE

**THIS AGREEMENT** between ___ISLAND TRUE VALUE Hdwe INC.___

d/b/a ___Island True Value___ and ___JUST ASK RENTAL___

☒ True Value   ☐ Home & Garden Showplace   ☐ Induserve   ☐ Non-Branded
☐ Grand Rental   ☐ Party Central   ☐ Taylor Rental

of ___217 State Rd  Island Lake, IL  60042___
(Full Address)

the retail member hereinafter referred to as the "Member," and TRUSERV CORPORATION, a Delaware Corporation, hereinafter referred to as the "Company."

The Company is an organization operated on a cooperative basis by and for independent retailers who operate hardware stores, home or garden centers, rental stores or similar retail operations.

**WHEREBY** it is agreed as follows:

**THE COMPANY AGREES:**

To sell merchandise of the type typically sold in retail hardware stores or home and garden centers or rented at full service rental centers, to provide for shipment or delivery of such merchandise to the Member's address indicated on this Agreement, to permit use of the service mark associated with the program checked above ("Designated Mark") and other permitted Company owned servicemarks, trademarks, collective membership marks, tradenames or brandnames ("Marks") under the conditions of this Agreement for so long as the Company has a current registration, and to offer services to the Member.

To invoice at the Company's current prices in respect of the category of merchandise and services involved, and to apply all payments by Member toward final settlement of the Member's financial obligations. The excess, if any, of the payments made, less any additional expenses due to non-conformance with established payment policies or prescribed procedures, shall be paid or credited to the Member.

To pay annually to the Member a Patronage Dividend on the basis of the volume of and margins applicable to merchandise and services purchased by the Member from the Company during each such year. Patronage Dividends shall be determined as of the end of each fiscal year of the Company and shall be payable out of the excess, if any, of gross margins from business done with or for Members, after deducting therefrom the following:

   (a) Expenses directly or indirectly related to such business;

   (b) Such reasonable reserves for necessary corporate purposes as may from time to time be provided by the Board of Directors for depreciation and obsolescence, state and federal taxes, bad debts, casualty losses, insurance and other corporate and operating charges and expenses, all established and computed in accordance with generally accepted accounting principles; and

   (c) Such reasonable reserves for working capital necessary for the operation of the Company and for deficits arising from such operation, including deficits from business other than business done with or for Members.

MA-TS 7/15/00

That within a reasonable time following but in no event later than the fifteenth day of the ninth month after the close of each fiscal year, the Patronage Dividends shall be computed in respect of such year and a proper allocation and payment thereof made to the Member based on the volume and applicable margins of merchandise and services purchased by the Member. Patronage Dividends are paid in accordance with the Company's By-Laws (principally Article IX thereof) which provide, in substance, as follows:

Re: Form of Patronage Distribution Generally

"The Board of Directors may, in its discretion, determine to pay Patronage Dividends either all in a form that will be treated as a deductible qualified written notice of allocation within the meaning of section 1388(c) of the Internal Revenue Code of 1986, as amended (hereinafter referred to as the "IRC"), all in a form that will be treated as a nonqualified written notice of allocation within the meaning of section 1388(d) of the IRC, or part in qualified form and part in nonqualified form. At least twenty percent (20%) of any qualified payment of Patronage Dividends shall be paid in cash. Subject to this limitation with respect to qualified distributions, the Board of Directors may decide that the balance of any Patronage Dividend be paid, in whole or in part, in cash, property, Class B Common Stock, promissory notes or other evidences of indebtedness, or in any other form of written notice of allocation (within the meaning of section 1388(b) of the IRC)." [IX section 2(a), in part.]

Re: Class B Common Stock

"With respect to the Patronage Dividend payable for each fiscal year, the Company may pay each Member a portion of such Patronage Dividend, not to exceed two percent (2%) of Member's net purchases (computed to the nearest multiple of $100) from the Company during such fiscal year, in shares of Class B Common Stock of the Company at the par value thereof; provided, however, that at least twenty percent (20%) of such Member's Patronage Dividend shall be paid in money or by qualified check." [IX section 3(a).]

Re: Promissory (Subordinated) Notes

"Subject only to the payment of at least twenty percent (20%) of each Member's annual Patronage Dividend in cash and distribution of Class B Common Stock as provided in section 3 of this Article IX, the Company may pay each Member all or any portion of the annual Patronage Dividend in Promissory Notes which shall bear interest at the rate from time to time fixed by the Board of Directors and shall mature at the time fixed by the Board of Directors not later than five (5) years from the date of issuance, and may be subordinated to any liabilities or obligations of the Company, existing, contingent or created after date of issuance." [IX section 4, in part.]

To hold Markets and other meetings from time to time for the purpose of keeping Members better informed on trends in the industry, presenting merchandise or services available and enabling Members to exchange ideas with fellow Members.

**THE MEMBER AGREES:**

Upon execution of this Agreement, to purchase sixty (60) qualifying shares of the Company's Class A Common Stock at a purchase price of $100 per share for each store owned by Member, to a maximum of three hundred (300) shares for five (5) or more stores, as defined in the Subscription to Shares agreement, attached hereto and made a part of this Agreement.

To establish, operate and maintain a retail hardware store, home or garden center ("Retail Store") retailing merchandise and services to consumers if the Designated Mark is True Value or Home & Garden Showplace, or a full service rental store ("Rental Center") renting appropriate merchandise if the Designated Mark is Taylor Rental or Grand Rental, or to carry on related retail activities if using any other Designated Mark indicated above, and to sell or rent merchandise carrying the Company's exclusive brands only at the retail location indicated on this Agreement.

To utilize the Company as its primary supplier for the types of merchandise offered by the Company under each Agreement for which a Member signs.

2

and may be revoked as provided in section 1388(c)(3)(B) of the IRC, provided, however, that, so long as Member remains a member of the Company, revocation by Member of its "consent in writing" shall not revoke Member's "membership consent."

That the Promissory Notes and Class A and Class B Common Stock need not be physically distributed to the Member but may be held in safekeeping for the Member (either in separate securities or as part of a bulk security) and that notices of the Member's allocation of Promissory Notes and Class B Common Stock to be deposited in safekeeping are "written notices of allocation" and shall be taken into account as provided for in this Agreement.

That this Agreement is not assignable or transferable by the Member without the written consent of the Company, but Company shall have the right to assign this Agreement. Change in control or management of a corporate, partnership or limited liability company Member must be approved in writing by the Company.

That this Agreement shall continue in force from year to year unless it is terminated as follows:

The Company shall have the right to immediately terminate this Agreement by written notice to the Member, (i) in the event and at the time or after the Member becomes insolvent, commits any act of bankruptcy, files a voluntary petition in bankruptcy, is adjudicated a bankrupt, or (ii) breaches any term, condition or obligation under this Agreement or any other agreement with the Company or one of its subsidiaries, which breach is not cured within thirty (30) days (ten (10) days in case of nonpayment of accounts receivable statements or any other financial obligations to the Company, or within the applicable cure period in an agreement with the Company subsidiary) after the Member's receipt of written notice of such breach from the Company.

This Agreement may be terminated unilaterally by the Member upon sixty (60) days written notice mailed to any executive officer of the Company at the Company's principal office.

This Agreement may be terminated unilaterally by the Company upon sixty (60) days written notice mailed to the Member at the address shown on the books of the Corporation; provided, however, that such termination by the Company shall occur after the affirmative vote of two-thirds or more of the directors then in office that such termination is in the best interests of the Company. Without limiting the generality of the foregoing, the following events shall be deemed to create situations in which it is prima facie in the best interests of the Company to terminate an agreement with a Member: death or incapacity of a Member, low or no participation, change in the nature, composition, management, or control of a Member's business organization, or Member engages in a course of conduct or undertakes actions which are reasonably determined by the Board of Directors to be materially adverse to the interests of the Company, or any other reason set forth in the By-Laws of the Company.

That this Agreement shall be automatically modified upon notice from the Company to the Member of any relevant change in the Certificate of Incorporation and/or By-Laws of the Company, or by resolution of the Board of Directors.

That this Agreement, and any other agreement which Member signs with the Company, is the entire and complete Agreement between the Member and the Company and that there are no prior agreements, representations, promises, or commitments, oral or written, which are not specifically contained in this Agreement or any other agreement which Member signs with the Company. That the current form of the Company Member Agreement shall govern all past and present relations, actions or claims arising between the Company and the Member.

That should any provision of this Agreement be declared invalid under or in conflict with any existing or future law or regulation such provision shall be modified to conform with that law and such modification shall not affect any other provision of this Agreement which shall continue in full force and effect.

That failure on the part of the Company at any time or times to enforce any breach by Member of the Membership Agreement, Certificate of Incorporation, By-Laws, or Policies of the Company, or of any written agreements with Member shall not constitute or be held to be a waiver of any succeeding breach thereof.

5

That the Company shall have a lien on and a right of setoff against any stock or notes, including those issued as Patronage Dividends, and against any cash portion of such Patronage Dividend which is in excess of twenty percent (20%) of the overall Patronage Dividend payable in any year for such indebtedness of the Member to the Company or its subsidiaries as may, for whatever cause, exist. In the event that the Company initiates proceedings to recover amounts due it by Member or for any breach of this Agreement or to seek equitable or injunctive relief against the Member, the Company shall be entitled to the recovery of all associated costs, interest and reasonable attorney's fees. This Agreement shall be enforced against either Member or Company, only in courts located in Cook County or any Illinois county contiguous to Cook County, Illinois, and only be interpreted in accordance with the substantive laws of Illinois without giving effect to its conflict of laws principles.

Prospective Member's signature on this Agreement constitutes an offer only and this Agreement shall have no force or effect until duly accepted and signed by the Company at its principal office and National Headquarters which is located at 8600 West Bryn Mawr Avenue, Chicago, Illinois 60631-3505.

WITNESS the Member's hand and seal this 13th day of January, 2003.

ISLAND TRUE VALUE Hdwe INC.
Member Entity

d/b/a  Island True Value

check:  ☐ sole proprietor  ☐ partnership  ☒ corporation  ☐ limited liability company

Retail Location Address  217 State Rd

City  Island Lake   State  IL   Zip 60042

By: [signature]

Title: President

WITNESS  HUGH W. REITMAN  [signature]

Address  106 MAINSAIL DRIVE

City  GRAYSLAKE   State  IL   Zip 60030

ACCEPTED this ___ day of _____, 20___, at Chicago, Illinois.

By TRUSERV CORPORATION, by its duly authorized agent.

_____

_____ President

MA-TS-7-15-00

6

# EXHIBIT C

# TRUE VALUE RETAILER MEMBER AGREEMENT with COTTER & COMPANY

GENERAL OFFICE—2740 CLYBOURN AVE.—CHICAGO, ILLINOIS 60614

THIS AGREEMENT between __ANTIOCH TRUE VALUE HARDWARE, INC.__

d/b/a __ANTIOCH TRUE VALUE HDW.__

of __910 N. MAIN ST.           ANTIOCH, IL  60002__
(Full Address)

the retailer member hereinafter referred to as the "Member," and COTTER & COMPANY a Delaware Corporation, with its principal office in Chicago, Illinois hereinafter referred to as the "Company,"

WHEREBY it is agreed as follows:

THE COMPANY AGREES:

To sell merchandise and furnish services to the Member for invoicing, shipment or delivery to the Member's address indicated on this Agreement at prices reflecting cost savings effected in Company operations during each fiscal year, and to pay annually to the Member a Patronage Dividend on the basis of the volume of and margins applicable to merchandise and services purchased by the Member from the Company during each such year. Patronage Dividends shall be determined as of the end of each fiscal year of the Company and shall be payable out of the excess of margins from operations after deducting therefrom the following:

(a) Expenses of operations;

(b) Such reserves as may from time to time be provided by the Board of Directors for depreciation and obsolescence, state and federal taxes, bad debts, inventory losses, fire losses, insurance and other corporate and operating expenses;

(c) Such reserves as may from time to time be provided by the Board of Directors for the purpose of enabling the Company to repurchase the shares of its Class A Common Stock and Class B Common Stock;

(d) Provision for working capital and for deficits arising from operation.

At the time of sale of merchandise and/or furnishing of service to the Member, the Company shall make preliminary or tentative billings at the level of wholesale warehouse distributor or jobbing prices then prevailing in respect of the category of merchandise and/or services involved. The Member shall remit to the Company the amount of such billings as deposits against the final settlements for such merchandise and/or services. Within a reasonable time following the close of each fiscal year the patronage dividends shall be computed in respect of such year and a proper allocation thereof made to the Member based on the volume of merchandise and/or services purchased by the Member and margins applicable thereto. The excess, if any, of the preliminary or tentative billings deposited, less any unusual expenses occasioned by extra handling and/or correspondence due to repeated non-conformance with established payment policies or prescribed procedures, shall be paid to the Member. The Member shall be entitled to receive within a reasonable time (but in no event later than the fifteenth day of the ninth month after the close of each fiscal year) his allocated share of patronage dividends computed as aforesaid. Patronage Dividends are paid in accordance with the Company's By-Laws (principally Article V11-A thereof) which provide, in substance, as follows:

Re: Form of Patronage Distribution Generally

"The Board of Directors may, in its discretion, determine to pay Patronage Dividends either all in a form that will be treated as a deductible qualified written notice of allocation within the meaning of section 1388(c) of the Internal Revenue Code of 1954, as amended, all in a form that will be treated as a nonqualified written notice of allocation within the meaning of section 1388(d) of the Internal Revenue Code of 1954, as amended, or part in qualified form and part in nonqualified form. At least twenty percent (20%) of any qualified payment of Patronage Dividends shall be paid in cash. Subject to this limitation with respect to qualified distributions, the Board of Directors may pay the balance of any Patronage Dividend, in whole or in part, in cash, property, Class B Common Stock, promissory notes or other evidences of indebtedness, or in any other form of written notice of allocation (within the meaning of section 1388(b) of the Internal Revenue Code of 1954, as amended)."[V11-A § 2(a)].

Re: Class B Common Stock

"With respect to the Patronage Dividend payable for each fiscal year, each Member shall be paid a portion of such Patronage Dividend equal to two percent (2%) of his net purchases (computed to the nearest multiple of $100) from the Company during such fiscal year in shares of Class B Common Stock of the Company at the par value thereof; provided, however, that at least twenty percent (20%) of such Member's Patronage Dividend shall be paid in money or by qualified check." [V11-A, § 3(a)].

"A Member's required investment in Class "B" Common Stock shall not exceed an amount (computed on the basis of the par value thereof and to the nearest multiple of $100) equal to eight percent (8%) of a Member's net purchases from the Company in the highest of the three preceding years. Provided, however, effective as of January, 1979, a Member's required investment in Class B Common Stock shall not exceed an amount (computed on the basis of the par value thereof and to the nearest multiple of $100) equal to (i) two per cent (2%) of a Member's net purchases of direct (drop shipment) sales from the Corporation and (ii) four percent (4%) of a Member's net purchases of relay sales from the Corporation and (iii) eight per cent (8%) of a Member's other net purchases from the Corporation in the highest of the three years." [V11-A § 3(b)].

Re: Promissory (Subordinated) Notes

"Subject only to the payment of at least twenty percent (20%) of each Member's annual Patronage Dividend in cash and distribution of Class B Common Stock as provided in Section 3 of this ARTICLE V11-1, the Board of Directors may pay all or any portion of the annual Patronage Dividend in Promissory (Subordinated) Notes which shall bear interest at the rate from time to time fixed by the Board of Directors and shall mature at the time fixed by the Board of Directors not later than seven (7) years from the date of issuance. The Promissory (Subordinated) Notes so issued may be subordinated to any liabilities or obligations of the Company, existing, contingent, or to be created thereafter (including, without limitation, bank debt and trade creditor debt existing at the date of issuance or thereafter coming into existence)." [V11-A § 4].

THE MEMBER AGREES:

To purchase qualifying shares of Cotter & Company stock as defined in the accompanying Subscription to Shares agreement, which is considered to be part and parcel of this agreement.

That in order to defray in part the costs of establishing the Member's account, Member will pay to the Company a sum equal to 10% of patronage dividends received by Member until $99 has by this means been recovered by the Company. If this agreement is terminated before the $99 has been recovered, then all of the patronage dividends thereafter coming due to the Member shall be applied to the payment remaining balance.

That Member's buying will be done according to the policies of the Company which include (1) entering warehouse orders using electronic order entry equipment functionally compatible with the Company's receiving equipment or, (2) buying relay and direct shipments by mail.

To pay each weekly term invoice on the due date of the Weekly Listment on which it first appears and to pay when due any and all other obligations to the Company and/or subsidiaries; to pay future-dated invoices (qualified members only) on the due date indicated on the invoices; and to be bound by the established Company policy of adding a 3% per month service charge on past due portions of accounts; with the Company having the exclusive right to designate the application of all payments received in respect to the Member's account. In the event of termination of this Agreement all invoices (including those which are "future-dated") and all other indebtedness from the Member to the Company shall become immediately due and payable.

To attend Member Meetings and Conventions which the Company agrees to hold at intervals as determined by its General Manager for the purpose of keeping Members better informed as to the trends of the industry, presenting new merchandise offerings and enabling Members to exchange ideas with fellow Members.

**100% MEMBER OWNED**
**WAREHOUSE DISTRIBUTION OF HARDWARE & RELATED LINES**

To meet requirements and obligations as stated in and to adhere to current "A" Page Policies and Procedures specified in Cotter & Company's Catalog and Price Book System.

That all information furnished the Member from week to week, such as bulletins, check lists, price services, illustrated catalogs, etc., is confidential and the Member shall at no time divulge or display any of the informative material pertaining to prices, shipments, lines, or brands of merchandise to anyone who is not affiliated with the Company. Such Information and material shall be used only in connection with the Member's purchases from the Company and for the purpose of promoting the Member's retail hardware business with the member's retail customers.

That the illustrated price catalog and weekly bulletins and all their contents are the property of the Company and furnished to the Member as a service, and such service may at any time be discontinued and the illustrated price service and price lists removed at the option of the Company.

To notify the Company in writing immediately upon any change in business name, form of organization, ownership or control.

That during the term of the Agreement, Member shall not obtain any proprietary rights in Company trademarks, trade names or brand names (including the "TRUE VALUE" trademark) by use thereof; and at the termination of this Agreement Member shall discontinue the use of such trademarks, trade names and brand names and remove at Member's expense all store Identification signs and decals which contain the trademark TRUE VALUE and any of the other trademarks owned by the Company within thirty days. Within that time, Member shall cease and thereafter will not advertise, directly or indirectly, as a TRUE VALUE Hardware store, and Member shall take all steps necessary to delete TRUE VALUE and said other trademarks from its business name including, if applicable, through amendment of its corporate name in the manner prescribed by the laws of the state in which the corporation of Member is organized. In the event of Member's neglect or failure to comply with the stipulations in this paragraph within the time stated, Member authorizes and fully empowers the Company, or its agent, at Member's expense, to enter upon its store premises, if necessary, and remove all exterior and interior signs, decals and other identification items specified in this paragraph.

That the amount of any distributions with respect to Member's patronage occuring on and after January 1, 1963 which are made in written notices of allocation (as defined in § 1388 of the Internal Revenue Code) and which are received by him from the Company, will be taken into account by Member at their stated dollar amounts in the manner provided in § 1385(a) of the Internal Revenue Code in the taxable year in which such written notices of allocation are received by Member. The Member understands and agrees that the Promissory (Subordinated) Notes and the shares of Class B Common Stock distributed by the Company in payment, or part payment of the patronage dividends, are "written notices of allocation" within the meaning of the statute and must be taken into account by Member. The stated dollar amount of the Promissory (Subordinated) Notes is the principal amount thereof and the stated dollar amount of the shares of Class B Common Stock is the par value thereof.

That the Promissory (Subordinated) Notes and Class B Common Stock need not be physically distributed to the Member but may be held in safekeeping for the Member (either in separate securities or as part of a bulk security) and that notices of the Member's allocation of Promissory (Subordinated) Notes and Class B Common Stock to be deposited in safekeeping are "written notices of allocation" and shall be taken into account at the stated dollar amounts thereof in the manner provided in § 1385(a) of the Internal Revenue Code in the taxable year in which received.

That Member acknowledges receipt of a set of the By-Laws of the Company which include a By-Law which provides that Membership in the Company constitutes consent to take written notices of allocation into account at their stated dollar amount as provided in § 1385(a) of the Internal Revenue Code in the taxable year in which received.

That Member acknowledges that the Board of Directors has the authority to set the composition of the Patronage Dividend each year, provided that at least twenty percent (20%) of each Member's share is paid in money or by qualified check.

THE AGREEMENT shall continue in force from year to year unless terminated by either party giving sixty (60) or more days written notice at any time to the other party of its intention to terminate this Agreement. Termination by the Company requires the approval of the two-thirds majority vote of the entire Board of Directors except in the following circumstances when the Company shall have the right to immediately terminate this Agreement by Written notice to the Member:, at anytime after the Member becomes insolvent, commits any act of bankruptcy, files a voluntary petition in bankruptcy, is adjudicated a bankrupt or commits a breach of any of its obligations created hereunder, which breach is not cured within ten (10) days after the Member's receipt of written notice of such breach from the Company. This Agreement shall be automatically modified upon notice from the Company to the Member of any relevant change in the Certificate of Incorporation and/or By-Laws of the Company provided such change in each instance receives the affirmative vote of a majority of stockholders entitled to vote at the regular or special stockholder's meeting duly called and held for such purpose, and as modified, shall continue in force in aforesaid.

The Company shall have a lien on, and a right of setoff against, any notes or stock which may from time to time be issued as patronage dividends, for such indebtedness of the Member to the Company as may from time to time, for whatever cause, exist. It is further understood and agreed that the affixing of the Member's signature and seal hereto consitutes an offer only and that this Agreement shall have no force or effect until duly accepted and countersigned by the Company at its principal office in Chicago, Illinois.

WITNESS the Member's hand and seal this _15th_ day of _OCTOBER_, 19_86_

WITNESS _Willie H. Livermon_
   First   Mid. Int.   Last

Address _762 Main St._

City, State, Zip _Antioch, Il. 60002_

ANTIOCH TRUE VALUE HDW.
d/b/a
ANTIOCH TRUE VALUE HARDWARE, INC. (SEAL)
Address _910 N. MAIN ST._
City, State, Zip _ANTIOCH, IL 60002_
By X _____
   First   Mid. Int.   Last

ACCEPTED this _14th_ day of _November_, 19_86_, at Chicago, Illinois.

By COTTER & COMPANY, by its duly authorized agent.

_____ (SEAL)
Signature and Title of Officer
Daniel A. Cotter

TVM14-012385